Ana R. PADILLA

v.

TWIN CITY FIRE INSURANCE COMPANY.

Supreme Court of Tennessee,
at Nashville.

June 3, 2010 Session.

Oct. 6, 2010.

H. Tom Kittrell, Jr. and T.J. Cross–Jones, Nashville, Tennessee, for the appellant, Ana R. Padilla.

Blakeley D. Matthews and Brian W. Holmes, Nashville, Tennessee, for the appellee, Twin City Fire Insurance Company.

## OPINION

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which JANICE M. HOLDER and SHARON G. LEE, JJ., joined.

This appeal involves the workers' compensation liability of an employer for the unsolved fatal shooting of an employee on the employer's premises. The employee's surviving spouse filed suit in the Chancery Court for Davidson County seeking death benefits under Tennessee's Workers' Compensation Law. Following a bench trial, the trial court denied the widow's claim for workers' compensation benefits. The court concluded that the employee's death was the result of a neutral assault and that the "street risk" doctrine was inapplicable because the employer's premises were not open to the public. On appeal, the Special Workers' Compensation Appeals Panel declined to presume that neutral assaults on

an employer's premises were compensable and affirmed the trial court's judgment. We granted the surviving spouse's petition for full court review. Like the Special Workers' Compensation Appeals Panel, we decline to engraft a non-statutory presumption favoring compensability in cases involving neutral assaults on the employer's premises. Accordingly, we affirm the judgment of the Special Workers' Compensation Appeals Panel and the trial court.

## I.

Jose Sanchez began working as an apprentice mill worker for Xelica LLC in 2001. Xelica manufactured windows and doors, and its shop was located in one of Nashville's light industrial areas near I–65 and Herschel Greer Stadium. Mr. Sanchez was generally the first employee to arrive at the shop each morning, and the owner of the business had given him permission to open the building and begin working.

On the morning of July 13, 2007, Mr. Sanchez arrived at the shop at 4:42 a.m.[1] George C. Moolman, the owner of the business, arrived at approximately 6:00 a.m. While he saw Mr. Sanchez's automobile in the parking lot, Mr. Moolman did not see Mr. Sanchez at his workstation when he entered the shop. Mr. Moolman began to look for Mr. Sanchez when he noticed that Mr. Sanchez's customary music was not playing and that the machines were not running. He discovered Mr. Sanchez lying near the rear shop door with two gunshot wounds in his chest and two in his head. He also saw a pipe laying across Mr. Sanchez's body. Mr. Moolman called the police.

Detective David Achord and Detective Brad Corcoran were dispatched to Xelica to investigate Mr. Sanchez's murder. They discovered bullet holes and damage to the lock on the interior of the shop door. They ascertained from Mr. Moolman that nothing had been stolen, including the petty cash which was found undisturbed in the office. Mr. Sanchez's personal effects were also undisturbed. The officers recovered his wallet, credit cards, and car keys from his person. Neighboring property owners reported hearing gunshots between 5:10 and 5:30 a.m., but no one reported seeing anything suspicious.

A subsequent police investigation uncovered little additional information. The detectives found no indication that Mr. Sanchez was involved in criminal activity or that he had any gang affiliations. The results of laboratory testing of DNA found at the crime scene were inconclusive. Although the authorities identified two "persons of interest," no charges were ever filed, and no arrests were made. Eventually, the case was turned over to the Metropolitan Police Department's homicide cold case unit.

On November 27, 2007, Ana R. Padilla, Mr. Sanchez's widow, filed suit in the Chancery Court for Davidson County seeking to recover death benefits under Tennessee's Workers' Compensation Law for herself and her daughter. Xelica and its workers' compensation insurance carrier, Twin City Fire Insurance Company ("Twin City"), filed an answer admitting only that Mr. Sanchez had been killed intentionally and denying that either Ms. Padilla or her daughter were entitled to workers' compensation benefits.

During the September 24, 2008 trial, Ms. Padilla presented evidence intended to establish that Xelica's shop was in a high-

---

1. The burglar alarm records showed that the alarm was deactivated, presumably by Mr.    Sanchez, at 4:42 a.m.

crime area. This evidence included the testimony of an owner of a nearby business who had installed a razor wire fence, retained an outside security guard to be on-call, and obtained a handgun permit after his business was burglarized over twenty times. Ms. Padilla also called an employee of the Metropolitan Police Department who testified that nine forced entry burglaries, three non-forced entry burglaries, and one murder had been committed in the area between 2005 and 2007. Finally, Mr. Moolman testified he had considered installing a security fence after Xelica had been burglarized twice.

At the close of Ms. Padilla's case, Twin City moved for a directed verdict on three grounds. First, it pointed out that the neighboring business that frequently had been burglarized sold truck parts, had a visible storefront, and was open to the public; while Xelica was not open to the public and did not deal in goods that attracted burglars. Second, it pointed out that Xelica's two burglaries had been "inside jobs" and that the employees responsible for these crimes had been fired, which is why Mr. Moolman eventually decided not to install a security fence. Third, it emphasized that nothing had been taken from Xelica or Mr. Sanchez when he was fatally shot. The trial court denied the motion for directed verdict.

The trial court filed its memorandum opinion and order on October 3, 2008. The court concluded that "the greater weight and preponderance of the evidence does not establish that the motive for the shooting was a burglary of Xelica." It also concluded that no evidence had been presented that the crime was connected to Mr. Sanchez's private life. Accordingly, following the analysis in *Wait v. Travelers Indemnity Co. of Illinois*, 240 S.W.3d 220, 227 (Tenn.2007), the trial court concluded that the shooting of Mr. Sanchez was a "neutral assault" because there was no proof that it was related to a crime against Xelica or to a personal conflict with Mr. Sanchez. The trial court also declined to apply the "street risk" doctrine. The court reasoned that even though Xelica's shop was located in an area with a "higher than average crime rate," the business did not advertise to the public, did not attract the public, and was not frequented by the public. Based on these findings, the trial court dismissed Ms. Padilla's complaint.

Ms. Padilla filed a notice of appeal pursuant to Tenn.Code Ann. § 50–6–225(e) (2008) on October 3, 2008. She presented the same arguments to the Special Workers' Compensation Appeals Panel that she had presented to the trial court. The Appeals Panel observed that Ms. Padilla was, in effect, asking the panel to adopt the minority rule that in cases involving neutral assaults where the proof is inconclusive, the burden should be placed on the employer to prove that the assault was unrelated to the employee's employment. The Appeals Panel declined to accept Ms. Padilla's invitation. Rather, the Appeals Panel concluded that the burden of establishing compensability was on the worker or the worker's survivors and that the evidence did not preponderate against the trial court's findings of fact.

Ms. Padilla sought review of the Appeals Panel's decision in accordance with Tenn. Code Ann. § 50–6–225(e)(5)(A)(ii). We agreed to hear this case in order to determine (1) whether the evidence preponderates against the trial court's finding that the motive for the killing was not a burglary, (2) whether the evidence preponderates against the trial court's finding that the street risk doctrine does not apply, and (3) whether Tennessee should recognize a non-statutory presumption in neutral assault cases that the injury is compensable.

## II.

█ In workers' compensation cases such as this one, this Court reviews a trial court's factual findings "de novo upon the record . . . accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn.Code Ann. § 50–6–225(e)(2); *Tryon v. Saturn Corp.*, 254 S.W.3d 321, 327 (Tenn.2008). The statute requires us to conduct an in-depth examination of the lower court's factual findings and conclusions. *Wilhelm v. Krogers*, 235 S.W.3d 122, 126 (Tenn.2007) (quoting *Galloway v. Memphis Drum Serv.*, 822 S.W.2d 584, 586 (Tenn.1991)). While we must give considerable deference to the trial court's findings of fact based on live testimony, *Anderson v. Westfield Grp.*, 259 S.W.3d 690, 695 (Tenn.2008); *Tryon v. Saturn Corp.*, 254 S.W.3d at 327, we need not give similar deference to findings based on documentary evidence such as depositions. *Glisson v. Mohon Int'l, Inc./Campbell Ray*, 185 S.W.3d 348, 353 (Tenn.2006); *Saylor v. Lakeway Trucking, Inc.*, 181 S.W.3d 314, 322 (Tenn.2005) (citing *Lang v. Nissan N. Am., Inc.*, 170 S.W.3d 564, 569 (Tenn.2005)). Once we have determined the facts, it is our responsibility to apply the law to those facts, attaching no presumption of correctness to the trial court's conclusions of law. *See generally Perrin v. Gaylord Entm't Co.*, 120 S.W.3d 823, 826–28 (Tenn.2003) (interpreting a statute of limitations and applying it to the trial court's factual findings).

## III.

█ To be compensable under Tennessee's Workers' Compensation Law, an injury must both arise out of the work and occur in the course of employment. *Wait v. Travelers Indem. Co. of Ill.*, 240 S.W.3d at 225; *Blankenship v. American Ordnance Sys., LLS*, 164 S.W.3d 350, 353–54 (Tenn.2005). These requirements are not synonymous. *Anderson v. Westfield Grp.*, 259 S.W.3d at 695–96; *Glisson v. Mohon Int'l, Inc./Campbell Ray*, 185 S.W.3d at 353. The requirement that the injury "arise out of" the work refers to the cause or origin of the injury; while the requirement that the injury occur "in the course of" the work involves the time, place, and circumstances of the injury. *Wait v. Travelers Indem. Co. of Ill.*, 240 S.W.3d at 225.

█ The parties in this case have not joined issue on whether Mr. Sanchez's death occurred in the course of the work. They have focused solely on whether the fatal attack on Mr. Sanchez arose out of his employment. We have recognized the following three categories for assaults that occur at the workplace:

(1) assaults with an "inherent connection" to employment such as disputes over performance, pay or termination; (2) assaults stemming from "inherently private" disputes imported into the employment setting from the claimant's domestic or private life and not exacerbated by the employment; and (3) assaults resulting from a "neutral force"[2] such as random assaults on employees by indi-

**2.** Professor Larson has explained that a neutral-risk case includes cases "in which the cause itself, or the character of the cause, is simply unknown." 1 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 4.03, at 4–3 (2009) ("*Larson's Workers' Compensation Law*"). He has illustrated this type of case by pointing out that

[a]n employee may be found to have died on the job from unexplained causes, or he or she may suffer a slip or fall for no reason that anyone, including the employee, can explain. An employee may be attacked by unknown persons, whose motives may have been personal or related to the employment.

1 *Larson's Workers' Compensation Law* § 4.03, at 4–3.

viduals outside the employment relationship.

*Woods v. Harry B. Woods Plumbing Co.,* 967 S.W.2d 768, 771 (Tenn.1998) (footnote added). Assaults falling into the first category are compensable. *Wait v. Travelers Indem. Co. of Ill.,* 240 S.W.3d at 227. Assaults falling into the second category are not. *Woods v. Harry B. Woods Plumbing Co.,* 967 S.W.2d at 771. The compensability of assaults falling into the third category "depend[s] on the facts and circumstances of the employment." *Woods v. Harry B. Woods Plumbing Co.,* 967 S.W.2d at 771.

■ Ms. Padilla insists that the only reasonable conclusion to be drawn from the evidence is that Mr. Sanchez was killed during a "burglary gone wrong" and, therefore, that the fatal assault was inherently connected with Mr. Sanchez's work. While the theory that Mr. Sanchez was killed during a burglary gone wrong is one of the reasonable conclusions supported by the evidence, it is not the only reasonable conclusion. The evidence can also be reasonably viewed to be inconsistent with a burglary. Xelica's business is not the sort of enterprise that attracted outside burglaries. There is no evidence of an effort to break into the business. If anything, the evidence of the damage to the inside of the doors suggests a perpetrator who was attempting to escape, not one who was attempting to enter the premises. Finally, there is no evidence that anything was taken from Xelica or from Mr. Sanchez. When viewed in its entirety, the evidence could also permit a reasonable person to conclude that Mr. Sanchez was killed during an entirely random assault. Whatever the true motive of the assailant may have been, the evidence does not preponderate against the trial court's finding that this was a neutral force assault.

## IV.

■ Ms. Padilla, conceding that the lower courts correctly concluded that the assault that killed Mr. Sanchez was a neutral assault,[3] also insists that the only reasonable conclusion to be drawn is that the "street risk" doctrine enables her to recover under Tennessee's Workers' Compensation Law even if Mr. Sanchez was killed as a result of a "neutral force" assault. Xelica and Twin City respond that the facts in this case do not support an application of the "street risk" doctrine. We agree with Xelica and Twin City.

■ We first adopted the "street risk" doctrine in 1979 to offer guidance in an otherwise murky area of the law. In a case involving a truck driver who was shot by two assailants while entering his truck after lunch, we held that "the risks of the street are the risks of the employment, if the employment requires the employee's use of the street." *Hudson v. Thurston Motor Lines, Inc.,* 583 S.W.2d 597, 602 (Tenn.1979). Thus, the purpose of the "street risk" doctrine is to "provide[ ] the necessary causal connection between the employment and the injury" when "the employment exposes the employee to the hazards of the street." *Hudson v. Thurston Motor Lines, Inc.,* 583 S.W.2d at 602.

---

**3.** Ms. Padilla concedes that the trial court and the Special Workers' Compensation Appeals Panel did not err by classifying the assault on Mr. Sanchez as a neutral assault. She states in her brief that

For the most part the appellant agrees with the trial court's findings of fact. In turn, the special workers' compensation panel issued a Memorandum Opinion which pretty well briefed the issue at hand, that is, whether there is a presumption in favor of the employee in a case of a neutral force assault.

The application of the "street risk" doctrine has now expanded to include employees whose work exposes them to the public. In a case involving an employee whose employer permitted her to work from a home office, we held:

> When an employee suffers a "neutral assault" within the confines of her employer's premises—whether the premises be a home office or a corporate office—the "street risk" doctrine will not provide the required causal connection between the injury and the employment unless the proof fairly suggests either that the attacker singled out the employee because of his or her association with the employer or that the employment indiscriminately exposed the employee to dangers from the public.

*Wait v. Travelers Indem. Co. of Ill.*, 240 S.W.3d at 230.

In the case before us, the trial court recognized the proper boundaries of the "street risk" doctrine but found that its requirements were not met. Even though the court acknowledged that "Xelica is located in a neighborhood with a higher than average crime rate," it found persuasive the dissimilarities between Xelica and the neighboring business that had been burglarized frequently. The trial court noted that, unlike its neighboring business, "Xeli-ca was not frequented by the public nor did it advertise or attract the public." The court also noted that Xelica was secured with locks and a burglar alarm. The court concluded that "the conditions of Mr. Sanchez' [sic] employment at Xelica did not indiscriminately expose him to dangers of the public, including the danger of crime in the neighborhood."

Ms. Padilla argues that Mr. Sanchez's job "put him first in line to encounter intruders" because he was the first employee at the shop each morning.[4] While it is uncontested that Mr. Sanchez was the first person to arrive at the shop, the evidence supports the conclusion that, when Mr. Sanchez was at the shop, he was as removed from the public as he could possibly be. The business was not open to the public. Mr. Sanchez's duties did not require him to deal with the public. Members of the public were rarely in the shop. The record contains no evidence that members of the public frequented the vicinity of the shop during the early morning hours more than at other times during the day. As tragic as the facts of this case are, they do not provide a sound basis for us to conclude that the evidence preponderates against the trial court's conclusion that the "street risk" doctrine does not apply to this case.[5]

---

**4.** The record is clear that Mr. Sanchez's job did not require him to be the first person at the shop each morning. In fact, Mr. Sanchez had repeatedly requested Mr. Moolman to permit him to open the shop early because Mr. Sanchez did not desire to return home after driving Ms. Padilla to work each morning. Mr. Moolman eventually accommodated Mr. Sanchez by allowing him to open the shop.

**5.** The facts of this case differ significantly from the facts of *Braden v. Sears, Roebuck & Co.*, 833 S.W.2d 496 (Tenn.1992) that involved an assault and robbery on a Sears television repair technician. The technician was assigned a Sears van which he drove to his customers' houses during the day and then parked in his driveway at night. At the end of each day, another Sears employee came to the technician's home to collect the payments received during the day, to restock the van with parts, and to provide the technician with his service calls for the next day. The technician was assaulted and robbed one evening in his driveway while he was preparing his van for the next day. He was wearing his Sears uniform at the time. Based on these facts, the Court invoked the street risk doctrine because "[i]t is ... reasonable to conclude Plaintiff was targeted for attack because of his association with Sears, and in hope that this association would sweeten the

## V.

■ As a final matter, we turn our attention to whether Tennessee's Workers' Compensation Law requires or permits a presumption that employees injured in a neutral force assault are entitled to compensation unless the employer can prove that the injury arose from the employee's personal activities. Ms. Padilla asserts that such a presumption is not inconsistent with the law or with this Court's interpretations of the law. We respectfully disagree.

Tennessee's Workers' Compensation Law was enacted to provide injured employees with a streamlined process to receive compensation for work-related injuries. It did so by replacing common-law tort remedies with a no-fault system that provides compensation for work-related injuries based on a schedule of benefits. *See Woods v. Harry B. Woods Plumbing Co.*, 967 S.W.2d at 772; *Liberty Mut. Ins. Co. v. Stevenson*, 212 Tenn. 178, 182, 368 S.W.2d 760, 762 (1963); *Partee v. Memphis Concrete Pipe Co.*, 155 Tenn. 441, 444, 295 S.W. 68, 69 (1927). To be entitled to recover the statutory workers' compensation benefits, an employee need only show that his or her injury arose out of and occurred in the course of employment. *Wait v. Travelers Indem. Co. of Ill.*, 240 S.W.3d at 225.

■ Tenn.Code Ann. § 50–6–116 (2008) directs the courts to construe the Workers' Compensation Law as a "remedial statute, which shall be given an equitable construction by the courts, to the end that the objects and purposes of [the Workers' Compensation Law] may be realized and attained." However, even though the courts now construe the Workers' Compensation Law liberally in favor of the injured employee or beneficiary, *Crew v. First Source Furniture Grp.*, 259 S.W.3d 656, 664 (Tenn.2008); *Brown v. Erachem Comilog, Inc.*, 231 S.W.3d 918, 921 (Tenn. 2007), we have held consistently that the burden of proving the entitlement to workers' compensation benefits is always on the injured employee or beneficiary. *See, e.g., Excel Polymers, LLC v. Broyles*, 302 S.W.3d 268, 274 (Tenn.2009); *Cloyd v. Hartco Flooring Co.*, 274 S.W.3d 638, 643 (Tenn.2008); *Whirlpool Corp. v. Nakhoneinh*, 69 S.W.3d 164, 168 (Tenn.2002).[6]

Professor Larson has correctly noted that the effect of placing the burden of proof on the injured employee with regard to injuries caused by neutral risks generally results in requiring the employee, rather than the employer, to bear the loss. 1 *Larson's Workers' Compensation Law* § 4.03, at 4–3. While he has also noted that the cases are now "more evenly divided" with regard to the compensability of neutral assaults,[7] many of the cases finding

---

fruits of the crime." *Braden v. Sears, Roebuck & Co.*, 833 S.W.2d at 499.

**6.** When an employee presents some evidence that his or her injury arose out of and occurred in the course of his or her employment, the courts will resolve any reasonable doubt about whether the injury arose out of the employment in the employee's favor. *DeBow v. First Inv. Prop., Inc.*, 623 S.W.2d 273, 275 (Tenn.1981). However, this principle does not apply without some evidence. As this Court noted, "[t]he liberal construction rule applying to workers' compensation cases is not broad enough to supply proof where

none exists." *Legions v. Liberty Mut. Ins. Co.*, 703 S.W.2d 620, 623 (Tenn.1986).

**7.** 1 *Larson's Workers' Compensation Law* § 8.03[3], at 8–67. Of the twenty jurisdictions cited by Professor Larson, eight jurisdictions permitted recovery based on the positional risk doctrine; four jurisdictions permitted recovery based on statutes that lack a counterpart in Tennessee; and seven jurisdictions used the street risk doctrine to conclude that the assault arose out of the employment. The case cited by Professor Larson as an example of Ohio law is actually a case from Indiana. Although not cited

compensability are based either on a statutory presumption that an assault occurring on the work premises is work-related or on the fact that the nature of the employee's work exposed the employee to the risk of assault. In cases where an employee sustains an injury at work from a neutral risk and there is no evidence that the risk was connected personally to the employee, the "positional risk" doctrine permits the employee to recover because the slender connection with the employee's work "is at least stronger than any connection with the [employee's] personal life." 1 *Larson's Workers' Compensation Law* § 4.03, at 4-3.

Tennessee's courts have recognized that the Workers' Compensation Law does not render an "employer an insurer against every accidental injury ... occurring during employment." *Scott v. Shinn,* 171 Tenn. 478, 483, 105 S.W.2d 103, 105 (1937). Thus, Tennessee's courts have consistently held that "the mere presence of the employee at the place of injury because of employment will not alone result in the injury being considered as arising out of employment." *Lennon Co. v. Ridge,* 219 Tenn. 623, 636, 412 S.W.2d 638, 644 (1967) (quoting *Knox v. Batson,* 217 Tenn. 620, 631, 399 S.W.2d 765, 770 (1966)); *see Jackson v. Clark & Fay, Inc.,* 197 Tenn. 135, 137, 270 S.W.2d 389, 390 (1954); *Thornton v. RCA Serv. Co.,* 188 Tenn. 644, 646, 221 S.W.2d 954, 955 (1949). Based on these settled holdings, this Court has repeatedly rejected a general application of the positional risk doctrine. *Bell v. Kelso Oil Co.,* 597 S.W.2d 731, 734 (Tenn.1980); *Hudson v. Thurston Motor Lines, Inc.,* 583 S.W.2d

at 599–600; *Lennon Co. v. Ridge,* 219 Tenn. at 636, 412 S.W.2d at 644.

The presumption that Ms. Padilla asks us to adopt is another variant of the positional risk doctrine. It would enable employees who are injured at work by a neutral risk to recover simply because they were injured at work. It would also dispense with the requirement that the injured employee or beneficiary prove that the injury arose out of the work. Rather than supporting Ms. Padilla's proposed presumption, our case law squarely rejects it. Accordingly, we decline Ms. Padilla's request to depart from our past precedents and leave it to the General Assembly to engraft such a presumption onto the Workers' Compensation Law if it so chooses.

## VI.

We affirm the judgments of the Special Workers' Compensation Appeals Panel and the trial court and remand the case to the trial court for whatever proceedings consistent with this opinion may be required. We tax the costs of this appeal to Ana R. Padilla and her surety for which execution, if necessary, may issue.

GARY R. WADE, J., filed a dissenting opinion. CORNELIA A. CLARK, C.J., not participating.

GARY R. WADE, J., dissenting.

I respectfully dissent. A basic principle of the Workers' Compensation Act ("the Act") is its remedial purpose. Tenn.Code Ann. § 50–6–116 (2008);[1] *Trosper v. Armstrong Wood Prods., Inc.,* 273 S.W.3d 598, 609 n. 5 (Tenn.2008). For years, this

---

by Professor Larson, the District of Columbia employs a statutory presumption of compensability based on the positional risk doctrine. *Clark v. D.C. Dep't of Emp't Servs.,* 743 A.2d 722, 728 (D.C.2000).

1. "[T]his chapter is declared to be a remedial statute, which shall be given an equitable construction by the courts, to the end that the objects and purposes of this chapter may be realized and attained."

Court has interpreted this statutory mandate to favor the employee under circumstances where there is "reasonable doubt" surrounding the compensability of a work-related claim. In my view, the claimant, in this instance, is entitled to the benefit of the doubt. Moreover, the "street risk doctrine," inaptly named, should serve as an alternative basis for the establishment of the causal relationship necessary to sustain the propriety of this claim.

This state's first workers' compensation laws were enacted in 1919. *Lynch v. City of Jellico*, 205 S.W.3d 384, 390 (Tenn.2006); *Scott v. Nashville Bridge Co.*, 143 Tenn. 86, 223 S.W. 844, 846 (1920). A purpose of the Act was to provide a remedy for the injury or death of an employee against an employer without regard to negligence or fault. *See Liberty Mut. Ins. Co. v. Stevenson*, 212 Tenn. 178, 368 S.W.2d 760, 762 (1963); *Partee v. Memphis Concrete Pipe Co.*, 155 Tenn. 441, 295 S.W. 68, 69 (1927). As stated in *Wait v. Travelers Indemnity Co.*, 240 S.W.3d 220 (Tenn.2007), the Act "is a legislatively created quid pro quo system where an injured worker forfeits any potential common law rights for recovery against his or her employer in return for a system that provides compensation completely independent of any fault on the part of the employer." *Id.* at 224 (citing Tenn.Code Ann. § 50–6–108(a) (2005)).

For an injury to be compensable under the Act, it must both arise out of and occur in the course of employment. *See* Tenn. Code Ann. § 50–6–102(12) (2008); *Blankenship v. Am. Ordnance Sys., LLS*, 164 S.W.3d 350, 353–54 (Tenn.2005). As stated by the majority, however, these statutory requirements are not synonymous. *See Sandlin v. Gentry*, 201 Tenn. 509, 300 S.W.2d 897, 901 (1957). Certainly, Jose Sanchez's death meets the second criteria—"in the course of" his employment—which refers to the "time, place, and circumstances." *Crew v. First Source Furniture Grp.*, 259 S.W.3d 656, 664 (Tenn.2008) (citing *Hill v. Eagle Bend Mfg., Inc.*, 942 S.W.3d 483, 487 (Tenn.1997)).[2] The question before us, therefore, is indeed whether the fatal attack on Sanchez arose out of his employment in the sense that his employment bore a causal relationship with his death.

When there is a causal connection between the conditions under which the work is required to be performed and the resulting injury, the injury arises out of the employment. *Fritts v. Safety Nat'l. Cas. Corp.*, 163 S.W.3d 673, 678 (Tenn.2005). While evidence of causation must not be speculative or conjectural, absolute "certainty is not required, and reasonable doubt must be resolved in favor of the employee." *Glisson v. Mohon Int'l., Inc./Campbell Ray*, 185 S.W.3d 348, 354

---

**2.** The general rule is that the injury is in the course of employment " 'when it takes place within the period of the employment, at a place where the employee reasonably may be, and while the employee is fulfilling work duties or engaged in doing something incidental thereto.' " *Blankenship*, 164 S.W.3d at 354 (quoting 1 *Larson's Workers' Compensation Law* § 12 (2004)).

In *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn.1991), this Court made the following observation:

The phrase "in the course of" refers to time, place, and circumstances, and "aris-

ing out of" refers to cause or origin. "[A]n injury by accident to an employee is in the course of employment if it occurred while he was performing a duty he was employed to do; and it is an injury arising out of employment if caused by a hazard incident to such employment." Generally, an injury arises out of and is in the course and scope of employment if it has a rational connection to the work and occurs while the employee is engaged in the duties of his employment.

*Id.* (citations omitted).

(Tenn.2006) (citations omitted). Moreover, "the law does not distinguish between the probative value of direct evidence and the probative value of circumstantial evidence." *Hindman v. Doe*, 241 S.W.3d 464, 468 (Tenn.Ct.App.2007). Whether direct or circumstantial, evidence can be equally relevant, Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.01[5], at 4–11 (5th ed.2005), and equally probative, *McEwen v. Tenn. Dep't of Safety*, 173 S.W.3d 815, 825 (Tenn.Ct.App.2005) (citations omitted). Any material fact, of course, may be proven by using direct evidence, circumstantial evidence, or a combination of both. *State v. Phillips*, 138 S.W.3d 224, 230 (Tenn.Ct. App.2003); *Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 523 (Tenn.Ct.App. 2002).

In the case before us, Sanchez, who had been employed for several years by Xelica LLC, a limited liability corporation owned by George Moolman, opened business operations each day as a part of his job responsibilities.[3] Xelica, a manufacturer of windows and doors for distribution to sales outlets, was located in a light industrial area in Nashville. Just before 5:30 a.m. on July 13, 2007, area residents heard gunshots but otherwise saw nothing unusual at the business premises. When Moolman arrived at 6:00 a.m., Sanchez was not at his work station, the machines were not in operation, and music, which was typically turned on by the time of his arrival, was not playing. Moolman then discovered Sanchez's body. There were two bullet wounds to the chest and two to the head. A police investigation established that there was some damage to the door. The lead detective, David Achord, testified that "[t]here was a scratch on the exterior side of the door, and then there was some damage to the door frame itself where the dead bolt would lock and the door latch would lock." Detective Brad Corcoran testified that there were two doors on site: a roll-up door and a walk-through door. He stated that "[t]he walk-through door had a bullet hole or two, as I recall, that was in it. It looked like it had been shot from the outside in." He also stated that "There was some type of damage to the lock, as I recall now. It was damaged almost like it was knocked off." On cross-examination, he expressed uncertainty about whether the bullets were shot through the outside or the inside of the door. He confirmed that the damage to the lock was on the inside. Nothing had been stolen from the business and Sanchez's personal effects remained undisturbed. The investigation further established that Sanchez had no criminal history. The police were unable to determine any motive for his murder. There was no indication that the assault was connected in any way to the private life of Jose Sanchez. Ultimately, no one was charged with any crime, and the investigation was transferred to the cold case unit of the Metropolitan Police.

There was circumstantial evidence at trial. There was proof that Xelica was located in a high-crime area. For example, a nearby business, which sold auto parts, had been burglarized on over twenty different occasions. As a precaution, the owner had secured a handgun permit, hired a security guard, and placed razor wire fencing around his property. Moreover, the police had investigated nine other forced entries, three unforced entries, and one murder in the area between 2005 and Sanchez's death in 2007. Xelica had been burglarized on two different occasions, both of which were "inside jobs" by employees who were later terminated. Mool-

---

**3.** Whether that component of his job was at Sanchez's request or not is of no conse-

quence, because the employer is obviously the final authority as to the duties of employment.

man acknowledged that he had considered building a security fence as a means of added security. There was no suggestion that the murder was connected with either the fired employees at Xelica or those still on the payroll.

Twin City Fire Insurance Company, Xelica's workers' compensation insurance carrier, made three arguments: first, that the neighboring business that had been burglarized on several occasions was different, in that it was open to the public, while Xelica was exclusively a manufacturer; second, that Xelica's prior burglaries had been committed by its own employees; and third, that theft was an unlikely motive because nothing had been taken from the premises. While declining to grant a motion for directed verdict, the trial court ultimately agreed with Twin City's contentions, concluding that while the evidence did not connect the crime to Sanchez's private life, neither had it established that the motive for the murder was burglary, and, thus, the theory in support of recovery and the theory of the defense were equally plausible. Further, the trial court determined that the street risk doctrine, adopted in 1979 to "provid[e] the necessary causal connection between the employment and the injury" when "the employment exposes the employee to the hazards of the street," had no application under these circumstances. *Hudson v. Thurston Motor Lines, Inc.*, 583 S.W.2d 597, 602 (Tenn.1979).

Initially, I fear that the majority, by classifying this case as an assault resulting from a "neutral force" (or a random assault), has failed to give adequate consideration to the circumstantial evidence, largely unrefuted, presented in support of the claim for benefits, and in consequence, has neglected to give appropriate deference to the remedial nature of the Act. *See* Tenn. Code Ann. § 50–6–116. Language appear-

ing in *Martin v. Lear Corp.*, 90 S.W.3d 626 (Tenn.2002), illustrates my concern:

> Tennessee Code Annotated section 50–6–116 declares the Workers' Compensation statute to be remedial in nature, and directs that the statute "shall be given an equitable construction by the courts, to the end that the objects and purposes of this chapter may be realized and attained." "Accordingly, 'these laws should be *rationally but liberally construed to promote and adhere to the Act's purposes of securing benefits to those workers who fall within its coverage.*' "

*Id.* at 629 (emphasis added) (citations omitted); *see also Shubert v. Steelman*, 214 Tenn. 102, 377 S.W.2d 940, 943 (1964) (same).

This Court has consistently ruled that "any reasonable doubt as to whether an injury arose out of the employment is to be resolved in favor of the employee." *E.g.*, *Beck v. State*, 779 S.W.2d 367, 371 (Tenn. 1989). Even when the assault has been classified as "neutral," this Court has traditionally applied this principle and granted recovery to the employee. For example, in *Braden v. Sears, Roebuck & Co.*, 833 S.W.2d 496 (Tenn.1992), the employee, a television technician who made house calls to Sears customers in a van furnished by the employer, parked the van in his driveway at the end of his workday. *Id.* at 497–98. While reviewing work documents in order to organize his schedule for the following day, the technician was assaulted and robbed of twenty dollars by an unknown assailant. *Id.* at 498. Despite the employee being "off the clock" and away from the business premises, this Court sustained his workers' compensation claim, observing that the "arising out of" requirement is satisfied if an injury has a rational, causal connection to the work. *Id.* This Court confirmed the viability of the princi-

ple that "any reasonable doubt as to whether an injury arose out of the employment is to be resolved in favor of the employee." *Id.; see also Beck,* 779 S.W.2d at 371.

Further, Justice Frank Drowota, writing for the Court in *Braden,* concluded that "while we approve of the street risk doctrine as an *aid* to evaluate the causal relationship between certain injuries and employment, we caution that 'each case must be decided with respect to its own attendant circumstances and not by resort to some formula.'" 833 S.W.2d at 499 (emphasis added) (quoting *Bell v. Kelso Oil Co.,* 597 S.W.2d 731, 734 (Tenn.1980)). Even though the Court applied the street risk doctrine in *Braden,* the quoted language, I believe, also stands for the proposition that the doctrine need not be invoked when the circumstances of the case establish, even if marginally so, a causal connection between the assault and the employment.

Finally, unlike the majority, I view the street risk doctrine as either an augmentation of the basic claim or an alternative basis for recovery under these facts. As an initial matter, the street risk doctrine may be applied to injuries which occur at the place of employment as well as those on the "streets." *See Hurst v. Labor Ready,* 197 S.W.3d 756 (Tenn.2006); *Jesse v. Savings Prods.,* 772 S.W.2d 425 (Tenn. 1989). Further, the fact that Xelica did not engage in retail sales is not a valid reason to refuse application of the street risk doctrine to these circumstances. While explaining the nature of the street risk doctrine, this Court in *Hurst* observed that "workers whose employment exposes them to the hazards of the street, or who are assaulted under circumstances that fairly suggest they were singled out for attack because of their association with their employer, are entitled to establish

this causal connection with the aid of the street risk doctrine." 197 S.W.3d at 761 (quoting *Braden,* 833 S.W.2d at 499). In *Hurst,* while the employee waited outside his employer's building to be paid, a manager refused to allow a passerby into the building to use a restroom in accordance with company policy. 197 S.W.3d at 758–59. A dispute ensued, and the employee was shot and killed. This Court concluded that Hurst was "singled out for attack because of [his] association" with his employer due to the fact that he was readily identifiable as an employee and the shooting "stemmed from" Labor Ready's enforcement of its own policies. *Id.* at 761–62.

The case before us presents an even stronger claim than that in *Hurst.* When an employee, who is authorized to open business operations in a location particularly vulnerable to criminal activity, is shot and killed by an assailant who had gained entry into the premises by means unknown, surely his family is entitled to benefits. Under circumstances such as these, an employee should expect workers' compensation coverage.

In summary, I believe that the circumstantial evidence in this instance is sufficient for this Court to resolve "reasonable doubt" as to causation favorably to the employee. The remedial nature of the statute would justify that. Further, the street risk doctrine, in my view, provides either an "aid" justifying the claim or an alternate basis for recovery. In *Larson's Workers' Compensation,* the author addresses occasions when an assault occurs for which there is no explanation or cause, and "even with all the facts available, no one can figure out why the assault was committed. Nothing connects it with the victim privately; neither can it be shown to have had a specific employment origin." 1 Arthur Larson & Lex K. Larson, *Lar-*

son's *Workers' Compensation, Desk Edition* § 8.03[3], at 8–44 (2008). This treatise suggests the following remedy:

> If the claimant is in fact exposed to that assault because he or she is discharging employment duties at that time and place, there is no better reason here than in the unexplained-fall or death cases to deny an award merely because claimant cannot positively show that the assault was motivated by something connected with the work. Although the cases are more evenly divided on unexplained assaults than on unexplained falls or deaths, *there is now a demonstrably larger body of authority for awarding compensation* on these facts than for denying it.

*Id.* (emphasis added). By the ruling today, this Court appears to have adopted the minority view among the states that have considered the issue. Finally, as to the street risk doctrine, the following language addresses the three kinds of risks identified in the majority opinion, but offers a more preferable result:

> There are thus three categories of risk; but unfortunately, there are only two places where the loss may fall—on the industry or on the employee. And so the question becomes, which bears the burden of this in-between category of harms?
>
> ... [T]he usual answer in the past has been to leave this loss on the employee, on the theory that he or she must meet the burden of proof of establishing affirmatively a clear causal connection between the conditions under which the employee worked and the occurrence of the injury. More recently, however, some courts have reasoned in the following vein: *Either the employer or the employee must bear the loss; to show connection with the employment, there is at least the fact that the injury oc-*

*curred while the employee was working; to show connection with the employee personally there is nothing; therefore, although the work connection is slender, it is at least stronger than any connection with the claimant's personal life.*

*Id.* § 4.03, at 4–3 (emphasis added). I agree with this assessment. While the connection between the death of Sanchez and his work perhaps qualifies as slender, surely the evidence creates "reasonable doubt" as to cause, because there was no connection whatsoever to his personal life.

For all of these reasons, I must respectfully dissent from the opinion of the majority.